**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

CODY H., b/n/f
DAVID and SHARON H.              §
     Plaintiffs,                 §
                                 §
v.                               §          CIVIL ACTION NO. H-03-5598
                                 §
BRYAN INDEPENDENT                §
SCHOOL DISTRICT,                 §
     Defendant.                  §

**MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

On March 19, 2004, the parties consented to proceed before a United States Magistrate Judge, for all further proceedings, including trial and entry of final judgment, under 28 U.S.C. §636 (c). (Docket Entry # 9). In this action, David and Sharon H. ask the court to review a determination that the Bryan Independent School District must provide resource education to their son, Cody. (Docket Entry # 1). Plaintiff and Defendant have filed cross-motions for summary judgment on that claim, and Defendant has responded to Plaintiffs' arguments, as well. (Defendant Bryan Independent School District's Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 19; Petitioner's Motion for Summary Judgment and Response to Respondent's Motion for Summary Judgment ["Plaintiffs' Motion"], Docket Entry # 20; Bryan Independent School District's Response in Opposition to Plaintiffs' Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 21). After considering the pleadings and the applicable law, it is ORDERED that Plaintiffs' motion is DENIED, and that Defendant's motion is GRANTED.

1

**Background**

At the center of this lawsuit is a disagreement between Cody H.'s parents and his teachers, about the best way to educate him.  It is uncontroverted that Cody suffers from Down syndrome, mental retardation, and speech impairments. (Plaintiff's Motion at 4, 6; Due Process Hearing Transcript ["Tr."] Volume ["Vol."] I at 5: Decision of the Hearing Officer; Tr. Vol. II at 141-45: Testimony of David H.).  David and Sharon H. ("Plaintiffs") believe that, despite those disabilities, Cody should be included fully in a regular elementary school class.  Cody's teachers and psychologists agree, in the main, with that plan.  They contend, however, that Cody needs "resource" instruction, that is, individualized instruction, in mathematics and language arts.  Plaintiffs have challenged that recommendation through a number of administrative proceedings, and have invoked their right to judicial review,  under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq.* to appeal  the education plan now in place.  (Plaintiffs' Motion at 1).  That plan, which resulted from an administrative hearing before the Texas Education Agency, calls for the Bryan Independent School District ("Defendant," "BISD," "the District")  to provide Cody with ten hours of "resource instruction," or special education, during each school week.  Plaintiffs agree that Cody is legally entitled to, and should receive, some special services, but they insist that the current plan is inappropriate.  They ask the court to set aside that plan and  order the District to leave Cody in the regular classroom for the entire school day.  (Original Petition ["Complaint"], Docket Entry # 1).

At the time of the administrative hearing, Cody H. was an eleven year old, fifth grade student at Crockett Elementary School ("Crockett"), in Bryan, Texas.  (Defendant's Motion at 7; Plaintiffs' Motion at 4).  During his first three years at Crockett, Cody was in a regular classroom, but was assisted by paraprofessional aides.  From September 2001, through February 2003, Cody also

received "resource" instruction, for five hours each week, in mathematics and language arts.[1] (Defendant's Motion at 6; Tr. Vol. I at 5, 8: Decision of the Hearing Officer).  His parents were agreeable to that arrangement in the beginning, and there were few reported problems.

In February 2003, the school invited Cody's parents to participate in a meeting with his teachers and counselors, to develop an ongoing educational plan.  (Tr. Vol. I at 5: Decision of the Hearing Officer).  At that meeting, David and Sharon H. expressed concern that Cody was mimicking the behavior of other disabled children in the resource room.  (*See* Tr. Vol. II at 117: Testimony of Sharon H.).  They asked the District to stop Cody's resource instruction, and instead, implement a "Behavior Intervention Plan," to address recent problems with his conduct.  The District agreed to those changes on a temporary basis, and over the next few months, Cody was in a "full inclusion setting without any resource," but with the increased use of classroom aides.  (Defendant's Motion at 5; Tr. Vol. I at 5: Decision of the Hearing Officer).  In the classroom, his aides used manipulative learning tools such as clocks with moveable hands, large plastic numbers and letters, and coins.  In addition, the school psychologist, Molly Perry ("Perry"), gave Cody speech therapy and "Content Mastery" instruction.  Cody remained in that setting until the end of the fourth grade.  (*Id.*).  While in the regular classroom, Cody was evaluated by several BISD teachers and psychologists, as well as by psychologists from Texas A&M University.

Those evaluations concluded that, unfortunately, when the resource instruction was discontinued, Cody "became increasingly off-task and resistant to classwork and to transitioning [sic] between classes and activities."  (Tr. Vol. I at 6: Decision of the Hearing Officer).  Conduct problems

---

[1]Cody went the resource room during his entire third grade year, and the first half of his fourth grade year.

were reported more frequently.  (*Id.* at 3).  Cody often struck his classmates and teachers;  he refused to return to the classroom after recess;  he crawled on the floor or under his desk;  and used inappropriate language.  He was also less successful in completing assignments.   (*Id.*).  Perry reported that Cody often refused to work, was easily distracted, and paid less attention to detail.  (Tr. Vol. II at 191 *et seq.*: Testimony of Molley Perry).  Ultimately, his classroom teacher, Frances Veech ("Veech"), concluded that Cody was not making appropriate progress.  (*Id.* at 241: Testimony of Frances Veech).

   Cody's teachers met with David and Sharon H. two more times, in May and June 2003.  At those meetings, Perry reported that Cody was more focused, and better behaved, when placed in the school's resource room.  (Defendant's Motion at 16).  She also told Plaintiffs that Cody's work and test scores had improved when the special instruction was renewed.  (*See id.* at 17-18).  Based on Perry's findings, and the results of the BISD and Texas A&M evaluations, the District recommended that Cody return to the resource setting for math and language arts.  (Tr. Vol. II at 154: Testimony of Paula Butler; Plaintiff's Motion, Ex. D: Oral Deposition of Paula Butler at 27).

   David and Sharon H. objected to that proposal.  In July 2003, they filed a request for a hearing with the Texas Education Agency.  (Defendant's Motion at 4 and Exhibit ["Ex."] A: Request for Due Process Hearing).  They complained, specifically, that the District had "failed to provide appropriate educational interventions, modifications, and accommodations for [Cody's] mental retardation"; failed to measure Cody's progress properly; failed to properly address disciplinary matters or provide an appropriate behavior intervention plan; and failed to provide properly trained staff members, to ensure that he stayed on task.  (Defendant's Motion, Ex. A: Request For Due Process Hearing).  They also argued that Cody should receive "continued mainstream placement on

4

the Crockett Elementary campus, and compensatory services, possibly to include one-on-one aide(s) during parts of the day, tutoring, and training of teachers."   (Defendant's Motion at 7; *and see* Defendant's Motion, Ex. A: Request For Due Process Hearing).   On September 22, 2003, an independent hearing officer ("IHO") scheduled a due process hearing to consider those claims. Before the hearing took place, however, the District submitted an "Offer of Judgment" to Plaintiffs, in which it agreed to all of their requests, except one:  eliminating resource education for math and language arts.  (*Id.*; Defendant's Motion, Ex. C: Bryan ISD's Offer of Judgment).  Plaintiffs declined their offer.

On November 12, 2003, the IHO made partial findings in favor of both parties.  (Defendant's Motion at 4 and Ex. B: Decision of the Hearing Officer).  She found that the District had denied Cody a free, appropriate public education, under the IDEA, because

> Cody's full-time placement in the regular fourth-grade classroom for all academic subjects during Spring 2003, without a [behavior improvement plan], and with four aides who provided virtually all of his instruction and who did not provide consistent redirection and consistent behavioral rewards and consequences, was not reasonably calculated to provide an educational benefit . . .

(Tr. Vol. I at 8: Decision of the Hearing Officer).  The IHO ordered the District to create a new Individual Education Plan ("IEP") and Behavior Improvement Plan ("BIP") for him, and to train his teachers and aides to administer them properly.  She also concluded, however,  that

> Cody needs specialized instruction in language arts and math outside the regular classroom due to the nature and severity of his cognitive disability.  Cody's proposed placement in a regular classroom with modifications and supports, a BIP, resource room instruction for language arts and math, Content Mastery, and speech services is the least restrictive environment appropriate at this time.

(*Id.*).  David and Sharon H. disagree with that finding.  They insist that the IHO "was in error in placing Cody H. in classroom placements that are segregated from those attended by classmates who

5

are not disabled." (Complaint at 2). They ask the court to order the school to return Cody to the regular classroom on a full-time basis without any individual resource instruction at all.[2]

**Standard of Review**

Under the IDEA, "[w]hen a federal district court reviews a state hearing officer's decision in an impartial due process hearing . . . it must receive the record of the administrative proceedings and is then required to take additional evidence at the request of any party." *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000); *Cypress-Fairbanks Independent School Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997); 20 U.S.C. § 1415(i)(2). In conducting a review, the court must accord "due weight" to the hearing officer's findings. *Bobby R.*, 200 F.3d at 347; *Cypress-Fairbanks*, 118 F.3d at 252 (both citing *Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Ultimately, however, it must "reach an independent decision based on a preponderance of the evidence." *Id.*; *and see Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 131 (5th Cir. 1993). For that reason, the district court's review is described as "virtually de novo." *Bobby R.*, 200 F.3d at 347; *Cypress-Fairbanks*, 118 F.3d at 252. In fact, the United States Court of Appeals for the Fifth Circuit has explained that, "given its adducing of new evidence, even evidence of matters that have occurred since the administrative hearing under review, the district court proceeding under the IDEA is a hybrid, akin to a 'trial de novo.'" *Cypress-Fairbanks*, 118 F.3d at 252.

---

[2]At the moment, Cody is attending regular classes only, under the IDEA's "stay-put" provision. 20 U.S.C. § 1415(j) provides that "[d]uring the pendency of any proceedings conducted [under the IDEA], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement."

As a practical matter, the IDEA creates a presumption in favor of the education plan proposed by the school district, and places the burden of proof on the party challenging it. *Salley v. St. Tammany Parish Sch. Bd.,* 57 F.3d 458, 467 (5th Cir.1995).  Here, because David and Sharon H. challenge the school's recommended IEP, they bear the burden to show that it is inappropriate. *Id.*; *and see Cypress-Fairbanks*, 118 F.3d at 252.  To determine whether Plaintiffs have carried that burden, it is important to remember that

> Congress left the choice of educational policies and methods where it properly belongs - - in the hands of state and local school officials.  [The court's] task is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act.

*Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989).


## Discussion

### *The IDEA*

Congress enacted the IDEA in an effort "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs."[3] *Cedar Rapids Cmty. Sch. Dist. v. Garret F.,* 526 U.S. 66, 68 (1999); 20 U.S.C. § 1400(d)(1)(A).  A "free appropriate public education" ("FAPE") is defined as

> special education and related services which . . . have been provided at public expense, under public supervision and direction, and without charge, . . . meet the

---

[3]The title of the Act was changed from the "Education of the Handicapped Act" to the "Individuals with Disabilities Education Act" in 1990. Education of the Handicapped Act Amendments of 1990, Pub.L. No. 101-476, § 901(a)(1), 104 Stat. 1103, 1141-42 (1991).  Numerous cases interpreting the Act were decided prior to 1990, however, and they refer to the Education of the Handicapped Act.  Because those cases address the same legislative act, courts now refer to IDEA only, even when discussing those older cases.

standards of the State educational agency, . . . include an appropriate preschool, elementary, or secondary school education in the State involved, and . . .  are provided in conformity with [an] individualized education program.

*School Committee of the Town of Burlington, Mass. v. Dep't of Educ. of the Commonwealth of Massachusetts*, 471 U.S. 359, 367-368 (1985) (citing 20 U.S.C. § 1401(18)).  To ensure that all children receive a FAPE, the IDEA requires local educational agencies to develop "individualized education plans ("IEPs") to address the specific needs of each disabled child.  *Id.* at 368; *Honig v. Doe*, 484 U.S. 305, 311 (1988).  It also requires that handicapped children "be educated in regular education classrooms, with nonhandicapped students - - as opposed to special education classrooms with handicapped students only - - to the greatest extent appropriate."  *Daniel R.R.*, 874 F.2d at 1039.  To ensure that each child is educated in the "least restrictive environment," each state must establish

procedures to assure that . . . special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  This provision creates a strong preference in favor of "[e]ducating a handicapped child in a regular education classroom with nonhandicapped children," a practice which is often referred to as "mainstreaming."  *Daniel R.R.*, 874 F.2d at 1039.  However, the Act "also recognize[s] that regular education is not a suitable setting for educating many handicapped children."  *Id.* at 1045 (citing *Rowley,* 458 U.S. at 181 n. 4; *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 295 (7th Cir. 1988)).  For that reason, it

allows school officials to remove a handicapped child from regular education or to provide special education if they cannot educate the child satisfactorily in the regular classroom. Even when school officials can mainstream the child, they need not

8

provide for an exclusively mainstreamed environment; the Act requires school officials to mainstream each child only to the maximum extent appropriate. In short, the Act's mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom. Schools must provide a free appropriate public education and must do so, to the maximum extent appropriate, in regular education classrooms. But when education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education.

*Id.* (internal citations omitted).

In this lawsuit, Plaintiffs argue that if the IHO's decision is implemented it will violate the IDEA's mandate for education in the least restrictive environment. (*See* Complaint). The Fifth Circuit has established a flexible, two-part test to determine whether a proposed IEP complies with that mandate. *See Daniel R.R.*, 874 F.2d at 1048. That test requires the court to first inquire "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Id.* If not, the court must examine the plan's provision for special education or removal from regular education. In sum, the court must evaluate "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* In making this evaluation, a number of factors may be relevant, and "no single factor is dispositive in all cases." *Id.* Indeed, the court is to make "an individualized, fact-specific inquiry [and] examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the school's response to the child's needs." *Id.*

Here, to determine whether the District has complied with the IDEA, the first consideration is whether Cody can receive a free, appropriate education through regular instruction alone. This answer, in turn, centers on whether BISD "has taken steps to accommodate [Cody] in regular education"; "whether [Cody] will receive an educational benefit from regular education"; and "what

effect [Cody's] presence has on the regular classroom environment and, thus, on the education that the other students are receiving." *Daniel R.R.*, 874 F.2d at 1048-49.  In this appeal, his parents argue that the District has not given Cody adequate services in the regular classroom, and so, it is impossible to determine whether he can learn in that environment.  *Compare Daniel R.R.*, 874 F.2d at 1050.   At the same time, however, they are adamant that Cody does benefit academically from regular math and reading lessons.  In fact, they contend that, with appropriate accommodation, Cody's progress in the regular class will improve.  They also insist that full inclusion is beneficial to him and to his peers, and that continued instruction with disabled students only exacerbates his conduct problems.

     *1.*     *Accommodations*

It is critical to determine whether BISD's efforts to educate Cody in the regular classroom were legally sufficient.  It is well-settled that the IDEA "requires states to provide supplementary aids and services and to modify the regular education program when they mainstream handicapped children." *Id.* at 1048; *and see Rowley*, 458 U.S. at 189.  In fact, the Fifth Circuit has held that, if a school district's effort to supplement and modify the regular education curriculum is insufficient, then it has violated the mainstreaming requirement, as a matter of law.  *Daniel R.R.*, 874 F.2d at 1048.  But it is also settled that "[s]tates need not provide every conceivable supplementary aid or service," and that "the Act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition." *Id.*  This is so because

> mainstreaming would be pointless if we forced instructors to modify the regular
> education curriculum to the extent that the handicapped child is not required to learn
> any of the skills normally taught in regular education.  The child would be receiving

10

special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student.

*Id.* at 1049.

Here, the parties agree that BISD has given "supplemental aids and special services" to Cody, including instruction from paraprofessional aides, manipulative learning tools, Content Mastery instruction, and speech therapy.[4]  Further, when Cody had difficulty in Spring 2003, the school re-evaluated his setting, and obtained an independent review, to assist in structuring his IEP.  It is true that the IHO found that he is entitled to additional, and better, services in the mainstream setting, including more consistent redirection from aides and the use of "consistent behavioral rewards and consequences."  (Tr. Vol. I at 8: Decision of the Hearing Officer).  The court concludes, however, that the accommodations made for Cody's classroom instruction were more than "mere token gestures."  *See Daniel R.R.*, 874 F.2d at 1048.  In fact, those accommodations placed a heavy burden on the District.   For example, BISD's Director of Special Education Services, Paula Butler ("Butler"), testified that, at the time of the due process hearing, Cody was "working on kindergarten skills in the fifth-grade environment."  (Tr. Vol. II at 155: Testimony of Paula Butler).  It is clear, then, that Cody's teachers and aides devoted substantial time to modifying the regular curriculum to meet his needs.  The court agrees with Defendant that "[a]ny further modification would not only yield few benefits to Cody, but would possibly result in a regular education curriculum beyond recognition."  (Defendant's Motion at 15).  For those reasons, the court concludes that the special

---

[4]Although David and Sharon H. have raised complaints about some aspects of those services, they are not under review here.

services Cody received in the regular classroom were sufficient to comply with the IDEA. *Compare Daniel R.R.*, 874 F.2d at 1048.

    2.    *Educational Benefit*

The next factor to consider is whether Cody would receive an "educational benefit" if placed in the regular classroom full time, considering his "ability to grasp the essential elements of the regular education curriculum." *Id.* at 1049. But, this inquiry "must extend beyond the educational benefits that [Cody] may receive in regular education," and take into account the other purposes of mainstreaming, which include appropriate socialization. *Id.* In that regard, the court must evaluate Cody's "overall educational experience in the mainstreamed environment," and balance the benefits of the regular class setting with the special education proposed. *Id.*

The parties are divided sharply on this issue. David and Sharon H. are adamant that Cody does benefit academically in the regular classroom. (Plaintiffs' Motion at 11). They underscore that, when Cody was completely "mainstreamed," his grades were satisfactory. In fact, they contend that Perry fabricated records of Cody's regression in an effort to "segregate" him from his non-disabled peers. (*See id.* at 19-23). Plaintiffs concede that Cody's educational achievements might increase with resource instruction, but argue that "the benefit conferred [by an IEP] need not reach the highest attainable level or even the level needed to maximize the child's potential." (*Id.*) (citing *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (5th Cir. 1993)). Finally, Plaintiffs emphasize that "academic achievement is not the only purpose of mainstreaming," because a child "may benefit enormously from the language models that his non-handicapped peers provide for him." *See Daniel R.R.*, 874 F.2d at 1049. David and Sharon H. insist that, "if segregated Cody would lose <u>appropriate reciprocation</u> by his peers of normal speech, of normal social expectations, of normal obedience to

class rules and directives." (*Id.* at 19) (emphasis in original). At bottom, they argue that the benefit of any academic progress Cody may make in the resource room, is outweighed by the social opportunities he will lose if "segregated" from his non-disabled classmates.

In response to those contentions, the District notes that the standard for determining whether full inclusion is appropriate is whether a child obtains a *meaningful* educational benefit, not merely *any* benefit, from the regular classroom setting. (Defendant's Response at 5, 7) (citing *Daniel R.R.*, 874 F.2d at 1039). BISD also contends that David and Sharon H. overemphasize the beneficial socialization inherent in mainstreaming, as the proposed resource instruction would have little effect on Cody's peer interactions. (*Id.* at 6).

On this record, the court agrees with BISD. While it is true, as his parents note, that some evidence suggests academic progress when Cody was fully "mainstreamed," there is also evidence that Cody's academic skills suffered during that time. For example, Veech testified that she "[could] not say that [Cody] made no progress" in her class. (Tr. Vol. IV at 931: Oral Deposition of Frances Veech). And Dr. Mary Barringer, a Crockett school psychologist, reported that Cody's scores "never regressed." (*See* Tr. Vol. II at 227 *et. seq.*: Testimony of Mary Barringer). Further, the records from those months show classroom scores that ranged from 79-95%; progress in the Edmark and Accelerated Reader programs; and "satisfactory" conduct assessments. Perry testified, however, that after he was removed from the resource room, the quality of Cody's work suffered. She explained that, with special instruction, Cody was able to answer more questions correctly; his handwriting was "more controlled"; his work was more "independent"; and his test scores were higher. (Tr. Vol. II at 191: Testimony of Molley Perry).

13

In fact, even crediting the evidence Plaintiff relies on, the record, as a whole, still clearly supports the IHO's conclusion that Cody needs special instruction in math and language arts. Every BISD teacher testified that, to make meaningful academic progress, Cody must receive resource instruction in those subjects. (*See, e.g.,* Tr. Vol. II at 224, 233-34, 236). Cody's resource teacher, Barbara McMath, testified that he can meet his academic goals only if he receives resource time in math and language arts. (Defendant's Motion, Ex. F: Oral Deposition of Barbie McMath at 21). Butler testified that her "professional opinion is that for Cody to have meaningful benefit, that he needs some small group, one-on-one instruction." (Tr. Vol. II at 155: Testimony of Paula Butler; *and see* Plaintiffs' Motion, Ex. D: Oral Deposition of Paula Butler at 40). Dr. Barringer stated that:

> I believe that [Cody] would be served best, most appropriately, that he would make the most meaningful progress in a resource classroom for his math time and for his reading time, and that he could make meaningful progress for his socialization goals and probably, I believe, social studies and science too, probably, in general ed[ucation], where there's more opportunity for interacting with other kids and there's more of an opportunity for him to learn those skills there . . . My recommendation would be that he be in the general education setting for all of the school day except for when he's getting direct instruction in reading and in math.

(Tr. Vol. II at 224: Testimony of Mary Barringer). Adam Saenz, another BISD psychologist, stated that "based on [Cody's] presentation and his learning needs, he could make meaningful educational progress in both; not necessarily either/or, but both. He really needed placement in both to receive the meaningful educational [benefit]." (*Id.* at 236: Testimony of Adam Saenz). Finally, Veech testified that, "I think an appropriate setting for Cody would be for him to have time in a normal mainstreamed classroom, in a regular classroom in regular ed[ucation], and then be pulled out for periods of time for a small group instruction." (*Id.* at 241: Testimony of Frances Veech). No witness

tstified that Cody's need for resource instruction could be fulfilled through additional services in the regular classroom.

The court must also reject Plaintiffs' second contention. The Fifth Circuit has made clear that "the opportunity . . . to interact with nonhandicapped students," standing alone, is not a sufficient ground for mainstreaming. *Daniel R.R.*, 874 F.2d at 1051. Further, the evidence squarely contradicts Plaintiffs' argument that Cody will socialize less under the proposed plan. The record is uncontroverted that math and language arts lessons provide students with little opportunity for interaction. Perry testified, for example, that "[s]ocialization doesn't generally occur during academic subjects like language arts and math." (Tr. Vol. II at 203: Testimony of Molley Perry). Dr. Barringer testified that,

> [d]uring the core academic time . . .I did not see any interaction between Cody and the classmates. He tended to ignore pretty well . . .He didn't give me any indication that he was listening or attending to that academic activity that was going on. He was engaged in his own activity and his aide was working with him on that activity.

(*Id.* at 224: Testimony of Mary Barringer). Further, several teachers testified that Cody has ample time to socialize during science, social studies, physical education and music lessons. For all of those reasons, the court concludes that Cody does not receive a meaningful educational benefit from regular class education in math and language arts, either academically or socially. That finding weighs heavily in favor of affirming the IHO's order.

3.    *Effect on Classroom Environment*

A third, and final, inquiry is "what effect [Cody's] presence has on the regular classroom environment." *Daniel R.R.*, 874 F.2d at 1049. The court must consider whether Cody is "so disruptive in a regular classroom that the education of other students is significantly impaired," or

15

whether he requires "so much of the instructor's attention that the instructor will have to ignore the other student's [sic] needs in order to tend to the handicapped child." *Id.* Undoubtedly, if Cody "requires so much of the teacher or aide's time that the rest of the class suffers, then the balance will tip in favor of placing [him] in special education." *Id.* at 1049-50. Here, the parties agree that Cody's presence in the regular class benefits his peers. Although Cody's aides modified the regular curriculum to meet his IEP goals, there is no evidence that he "require[d] so much of the teacher or the aide's time that the rest of the class suffer[ed]." *Id.* at 1049-50. Further, Butler, Veech, Barringer, and Perry all testified that Cody's minor conduct problems do not justify his removal from regular education. (*See* Tr. Vol. II at 154, 222, 229, 240). Plaintiffs are correct that "[i]nclusion in regular education has no negative benefits upon Cody or his peers in the regular education classroom." (*See* Plaintiffs' Motion at 10).

Overall, however, the court concludes that, despite BISD's genuine efforts towards accommodation, Cody cannot be educated satisfactorily in the regular classroom. Each teacher and psychologist who worked with him testified that, to make progress in language arts and math, Cody needs resource instruction. Further, while Cody clearly benefits from opportunities to socialize with his non-disabled peers, inclusion in the regular classroom during math and reading lessons would provide little interaction. It is clear that Cody will make no meaningful progress, whether academic or social, through regular instruction in those subjects. It follows that placement in the regular setting exclusively would deny him the free, appropriate public education to which he is entitled under the IDEA.

*Mainstreaming Requirement*

The court must also determine "whether the school has mainstreamed [Cody] to the maximum extent appropriate." *Daniel R.R.*, 874 F.2d at 1048. "If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the [IDEA]." *Id.* at 1050. Here, the IHO ordered that Cody stay with his class during science, social studies, physical education, music, computer instruction, lunch and recess. Again, the evidence is clear that Cody will receive ample socialization during those hours. *Compare Daniel R.R.,* 874 F.2d at 1048 (Fifth Circuit approved IEP which mainstreamed for lunch and recess only). Because the proposed educational plan allows for inclusion during every school hour except those in which Cody must receive special instruction for academic purposes, it is easy to conclude that it "mainstreams" him to the maximum extent appropriate. *See id.*

In sum, the court concludes that, although Cody has made some educational progress in the regular classroom setting, he must receive resource instruction in math and language arts, so that he may make *meaningful* progress in those areas. *Daniel R.R.,* 874 F.2d at 1048. While socialization is certainly important to Cody's overall growth, the remaining hours of the day will provide adequate opportunity for him to interact with his peers. For those reasons, the proposed IEP will provide Cody with a free public education, in the least restrictive environment appropriate for him. Accordingly, Plaintiffs' motion for summary judgment is DENIED, and Defendant's motion is GRANTED.

**Attorney's Fees**

Plaintiffs also ask the court to award them the reasonable attorney's fees incurred in this appeal, on both the administrative and district court levels. (Plaintiffs' Motion at 41). The IDEA

provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). However, "[a] finding that a party is a prevailing party only makes him eligible to receive attorneys' fees under the IDEA; it does not automatically entitle him to recover the full amount that he spent on legal representation." *Jason D.W. by Douglas W. v. Houston Independent School Dist.,* 158 F.3d 205, 209 (5th Cir. 1998). In fact, the IDEA bars recovery of attorney's fees, in some instances:

> [a]ttorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if--
> > **(I)** the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;
> > **(II)** the offer is not accepted within 10 days; and
> > **(III)** the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

20 U.S.C. § 1415(i)(3)(D). Here, the IHO found in Plaintiffs' favor on some of their claims, which typically would entitle them to recover some fees. But the record is clear that the District offered them a settlement, just before the due process hearing, which would have implemented all of the changes which they suggested, and on which they ultimately prevailed. Because Plaintiffs refused to settle, and did not secure any relief more favorable than BISD's "Offer of Judgment," their request for attorney's fees must be denied. 20 U.S.C. § 1415(i)(3)(D). Further, because Plaintiffs' position on the only remaining matter was rejected by the IHO and by this court, an award of attorney's fees is inappropriate. 20 U.S.C. § 1415(i)(3)(B).

**Conclusion**

Based on the foregoing, it is **ORDERED** that Plaintiffs' motion for summary judgment is

**DENIED**, and Defendant's motion is **GRANTED**.  Plaintiffs' request for attorney's fees is **DENIED**.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record.

SIGNED at Houston, Texas, this  <u>24th</u> day of June, 2005.

**MARY MILLOY
UNITED STATES MAGISTRATE JUDGE**